STATE OF NEBRASKA EX REL. DON STENBERG, ATTORNEY GENERAL, APPELLEE, V. AMERICAN MIDLANDS, INC., A NEBRASKA CORPORATION, DOING BUSINESS AS AMERICAN MIDLANDS OF NEBRASKA, INC., A NEBRASKA CORPORATION, ET AL., APPELLEE, AND JAMES C. BAZEMORE, INDIVIDUALLY AND AS AN OFFICER OF SAID AMERICAN MIDLANDS, INC., AND JEANINE J. BAZEMORE, ALSO KNOWN AS JEANINE J. REIFSCHNEIDER, INDIVIDUALLY AND AS AN OFFICER OR DIRECTOR OF SAID AMERICAN MIDLANDS, INC., APPELLANTS.

509 N.W.2d 633

Filed January 14, 1994.   No. S-91-741.

E. Terry Sibbernsen, P.C., for appellants.

Don Stenberg, Attorney General, and Mark D. Starr for appellee State.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

BOSLAUGH, J.

The plaintiff-appellee, State of Nebraska, through its Attorney General, originated this action in 1981 pursuant to Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq. (Reissue 1988). The State sought to enjoin the defendants from continuing to engage in unfair trade practices and also sought the assessment of civil penalties for such practices. Named as defendants in the action were the appellants, James C. and Jeanine J. Bazemore, along with numerous other individuals and corporations, including American Midlands, Inc., a Nebraska corporation. On January 5, 1983, after having previously issued a temporary restraining order, the district court sustained the State's motion for partial summary judgment and granted the injunction sought by the State. Due to the Bazemores' bankruptcy proceedings, the hearing on the issue of civil penalties was delayed until 1991. After that hearing, the district court assessed civil penalties for which, by the district court's order, the Bazemores and the corporate defendants were jointly and severally liable. The portion of the civil penalties which is at issue in this appeal amounts to $788,000.

On May 3, 1991, following the district court's assessment of civil penalties, the Bazemores moved for a new trial. The

corporate defendants did not join in that motion. On June 25, 1991, the district court overruled the motion for new trial, and the Bazemores, but not the corporate defendants, have timely appealed. The Bazemores assert that the district court erred in assessing civil penalties for violations of § 59-1602 in an action brought by the Attorney General and that the district court abused its discretion by imposing excessive civil penalties.

In its April 24, 1991, order assessing civil penalties, the district court stated:

American Midlands was headquartered in Omaha, Nebraska. In ads placed or circulated across the country it advertised the availability of agricultural loans. The telephone number given in its advertisements was answered in Omaha. American Midlands' employees, called loan correspondents, would be notified if interested parties had telephoned and would follow up by calling upon the prospect. If this follow-up proved successful, the American Midlands' representative would collect a fee of up to $7,500.00 in advance for services the company purported to render in finding a loan for its "client".

Beginning in mid July, 1980, a new client contract began to be used by American Midlands which indicated the advance fee would be placed in escrow and would be drawn against only as services were rendered. The contract also included a fee schedule which set forth the charges for the various services.

It appears that at most a handful of the hundreds of clients seeking loans ever obtained one. More effort and design appears to have gone into cultivating and maintaining a relationship with the client and reaping its benefits than in obtaining loans. Additional details of the company's operations and a discussion of the Bazemores' personal responsibility and liability for such operations may be found in this court's Order of January 5, 1983, which granted the State's Motion for Partial Summary Judgment on the issue of liability. Unfair or deceptive acts or practices prohibited by the Nebraska Consumer Protection Act were found to have been committed in connection with the "escrow" accounts . . . .

. . . .

American Midlands was the brainchild of James Bazemore. He had worked for a similar loan-finding business before starting his own company and, consequently, had some opportunity to become aware of the nature of the business and some of its problems. Because of his central role, he bears the greatest share of the responsibility for what transpired. Jeanine Bazemore, his wife, did have check writing authority over the business checking account and was in a decisionmaking position. She also bears some of the responsibility, particularly with regard to the escrow account . . . .

The district court's January 5, 1983, order, which is referenced above, states:

American Midlands, Inc. held itself out to the public as a loan finder. When clients applied for their services, a contract was executed and American Midlands, Inc. collected an advance fee, termed a service fee, from the client. There was also an origination fee involved.

The contract provided that the service fee was to be held in escrow. The company provided the loan correspondents with rubber stamps reading "American Midlands Escrow Account No. 11-201-1" and the client's check was stamped at the time the contract was executed.

The client's advance payment check was mailed to the American Midlands' Office in Nebraska and deposited in its bank account at various financial institutions within Nebraska including the Nebraska State Bank, Ashland Bank and Southwest Bank of Omaha.

None of these financial institutions were escrow agents and none of the accounts were escrow accounts. The authorized signers on these accounts were Mr. and Mrs. Bazemore. Upon deposit a portion of the advance payment was then transfered [sic] to another account from which the funds were used for the normal operating expenses of the company. A sum in the amount of 20% of the advance fees collected were remitted to loan agents, and part of the balance was used to purchase airplanes and automobiles to which the title was held by Jeanine J.

Reifschneider and J. J. B. Leasing, apparently a subsidiary of American Midlands.

Due to the above and other transactions, the escrow accounts were reduced to a negative balance leaving numerous claims of clients for amounts owed them and no funds from which to make refunds.

. . . .

The salaries of James C. Bazemore and his wife were not fixed and funds would be withdrawn at their own discretion when available.

An escrow account is one in which withdrawals from the account are subject to a condition [and] the accounts labeled escrow accounts by defendants here were not such accounts.

The Bazemores first argue that the Consumer Protection Act does not authorize civil penalties for violations of § 59-1602 in an action brought by the Attorney General. Section 59-1602 states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." In addition, § 59-1608 provides that "[t]he Attorney General may bring an action in the name of the state against any person to restrain and prevent the doing of any act prohibited by sections 59-1601 to 59-1622 . . . ."

In light of §§ 59-1602 and 59-1608, the Bazemores agree that the Attorney General properly brought this action to prevent them from continuing to engage in unfair trade practices. However, the Bazemores argue that the section authorizing civil penalties, § 59-1614, does not authorize the Attorney General to seek civil penalties for violations of § 59-1602. Section 59-1614 states in relevant part:

Any person who violates section 59-1603 or 59-1604 or the terms of any injunction issued as provided in sections 59-1601 to 59-1622, shall forfeit and pay a civil penalty of not more than twenty-five thousand dollars.

Any person who violates section 59-1602 shall pay a civil penalty of not more than two thousand dollars for each violation . . . .

For the purpose of this section, the district court which issues *any injunction* shall retain jurisdiction, and the

cause shall be continued, and in such cases the Attorney General acting in the name of the state may petition for the recovery of civil penalties.

With respect to violations of sections 59-1603 and 59-1604, the Attorney General, acting in the name of the state, may seek recovery of such penalties in a civil action.

(Emphasis supplied.)

The Bazemores argue that because the last paragraph of § 59-1614 specifically authorizes the Attorney General to seek civil penalties for violations of §§ 59-1603 and 59-1604, the statute is ambiguous as to whether the Attorney General is authorized to seek civil penalties for violations of § 59-1602. The Bazemores then cite *Hancock v. State ex rel. Real Estate Comm.*, 213 Neb. 807, 331 N.W.2d 526 (1983), and conclude that since § 59-1614 is a penal statute which must be strictly construed and since, according to the Bazemores, that section is ambiguous, it cannot be construed to authorize the Attorney General to seek civil penalties for violations of § 59-1602. We cannot agree with this conclusion.

Section 59-1614 clearly states that "the district court which issues *any injunction* shall retain jurisdiction, and the cause shall be continued, and in such cases the Attorney General acting in the name of the state may petition for the recovery of civil penalties." In this instance, the district court issued an injunction to prevent the Bazemores from continuing to engage in unfair trade practices, and the Attorney General properly sought civil penalties for the Bazemores' violations of § 59-1602.

The Bazemores also assert that the imposition of civil penalties in this instance is prohibited by article VII, § 5, of the Nebraska Constitution. That section of the Constitution states in relevant part that "all . . . penalties . . . arising under the general laws of the state . . . shall belong and be paid over to the counties respectively where the same may be levied or imposed" and that all such penalties "shall be appropriated exclusively to the use and support of the common schools" of the respective counties. The Bazemores cite *Abel v. Conover*, 170 Neb. 926, 104 N.W.2d 684 (1960), and argue that Neb. Const. art. VII, § 5, prohibits the imposition of monetary penalties in a civil

action. It is clear, however, that statutes providing for the assessment of civil penalties are not repugnant to the Nebraska Constitution. See, e.g., *State ex rel. Grams v. Beach*, 243 Neb. 126, 498 N.W.2d 83 (1993).

In *Abel*, the court held that a statute which provides for a penalty in excess of actual damages to be paid to an injured party in a civil action violates article VII, § 5, of the Nebraska Constitution. Unlike *Abel*, the present case does not involve the payment of civil penalties to a private plaintiff. Although the district court's order did not designate how the penalty would be distributed, it is implicit in such an order that the penalty imposed will be distributed in conformance with the provisions of article VII, § 5, of the Nebraska Constitution.

The Bazemores also argue that the imposition of civil penalties in this instance violates article VII, § 5, of the Nebraska Constitution because the Consumer Protection Act fails to specify that any civil penalties recovered pursuant to that act must be paid to the appropriate school fund. Again, the Bazemores' assertion lacks merit. The fact that a statute is silent as to the distribution of possible civil penalties does not render it inconsistent with the provisions of article VII, § 5, of the Nebraska Constitution. See *In re Estate of Rogers*, 147 Neb. 1, 22 N.W.2d 297 (1946).

Finally, the Bazemores contend that the trial court abused its discretion by imposing excessive civil penalties. Section 59-1614 authorizes a civil penalty of not more than $2,000 for each violation of § 59-1602. The district court's April 24, 1991, order states the following in arriving at the damages assessed:

American Midlands obtained checks from clients across the country totaling about 5.7 million dollars. [Over 1,300] clients gave American Midlands an advance fee payment pursuant to the revised contract containing the escrow account provision. Payment checks were deposited in a Nebraska bank. Payment was stopped on a number of these checks and the accounts on which some of them were drawn had insufficient funds, preventing the checks from being honored. Payment was collected on the checks of 788 of these clients, however. After deducting for stop payment checks, insufficient funds checks and

refunds, the net amount collected from American Midlands' clients who had entered into contracts containing the escrow account provision was just over 2.9 million dollars. It does not appear that any of these paying clients obtained loans through the efforts of American Midlands. If any did, it is a negligible number.

The district court then assessed civil penalties of $788,000, representing a penalty of $1,000 for each violation relating to the escrow account in which funds were actually obtained from the client. The Bazemores argue that because of their limited assets and income, they are unable to pay the civil penalties imposed, and they contend that the civil penalties are therefore excessive. However, as stated in *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex. 1980):

A primary consideration in determining whether a fine is excessive is whether it is fixed with reference to the object it is to accomplish. . . . Large penalties for anticompetitive business practices and usurious interest rates have been upheld by Texas courts when considered in light of the abuse the penalties were designed to cure.

See, also, *State v. Ralph Williams*, 87 Wash. 2d 298, 553 P.2d 423 (1976) (substantial civil penalties imposed for deceptive trade practices).

With respect to the activities of American Midlands and the Bazemores, the record shows that the clause regarding the escrow account was inserted into the client contract and that the escrow account was established in order to make American Midlands' clients "feel secure" in paying an advance fee to the American Midlands representatives. According to the client contract, the advance fee paid by the client was to be held in an escrow account and that account was to be charged as services were rendered for the benefit of the client. It is apparent, however, that American Midlands and the Bazemores acted in total disregard of the escrow provision in the client contract and inserted that provision into the contract merely to lull the client into a false sense of security.

The advance fees charged by American Midlands ranged from $1,500 to $7,500. As previously described, rather than maintaining these fees in an escrow account as set forth in the

contract, this money was diverted to pay sales commissions and operating expenses of American Midlands. A portion of money was also used to pay the Bazemores' "salaries" and to purchase automobiles and airplanes. The record also contains evidence that American Midlands' activities created significant financial hardship for American Midlands' clients. Under these circumstances, we conclude that the penalties imposed by the district court were appropriate.

The judgment of the district court is affirmed.

AFFIRMED.

CAPORALE, J., not participating in the decision.
SHANAHAN, J., not participating.