380 S.E.2d 238

**BISHOP COAL COMPANY**

v.

**Brenda SALYERS**

and

**The West Virginia Human Rights Commission.**

No. 18138.

Supreme Court of Appeals of West Virginia.

May 16, 1989.

72

Robert M. Steptoe, Jr., Steptoe & Johnson, Clarksburg, Richard J. Klein, Consolidation Coal Co., Pittsburgh, Pa., Steven P. McGowan, Steptoe & Johnson, Charleston, for appellant.

Betty Jean Hall, Dumfries, for appellee.

NEELY, Justice:

We granted this appeal to explore two issues of substantial concern in the administration of the West Virginia human rights law. The first of these issues is a review of our holdings in *Human Rights Commission v. Pauley*, 158 W.Va. 495, 212 S.E.2d 77 (1975) and *Human Rights Commission v. Pearlman Rlty. Agcy.*, 161 W.Va. 1, 239 S.E.2d 145 (1977), which allowed the West Virginia Human Rights Commission to award incidental "damages when warranted by the evidence, such award being always subject to judicial review." *Pauley* 158 W.Va. at 502, 212 S.E.2d at 80. The second issue concerns the appropriate standards to be applied by the West Virginia Human Rights Commission and the courts in awarding attorneys' fees to prevailing claimants in discrimination cases.

I.

Brenda Salyers, a female employee of Bishop Coal Company, filed a complaint with the West Virginia Human Rights Commission in 1981 alleging gender-based harassment, gender-based job discrimination, and gender-based discrimination in her training opportunities. After two hearings before a hearing examiner, the commission initially declined to follow the examiner's recommendation and dismissed the complaint in its entirety. Thereafter, however, upon complainant's motion to reconsider, the commission did reconsider and entered an award for $7,500 as compensatory damages for "mental anguish," $21,225 in attorney's fees, and $1,875.64 in related legal expenses. Bishop Coal appealed directly to this Court under *W.Va.Code*, 5–11–13 [1987].

In 1981, Ms. Salyers bid for a vacant job as a scoop operator in conformity with the terms of the coal industry labor contract. Ms. Salyers was not awarded the job, ostensibly because no foreman could vouch for her ability to operate a scoop. She protested to the employer that she had the necessary skill and the employer then arranged a test. Ms. Salyers admits that she didn't do very well during the test, but she nonetheless filed a contract grievance. During arbitration of that grievance the parties agreed to another test. The second test was also not very satisfactory, but there was substantial evidence that during both tests the equipment Ms. Salyers was asked to use was not in perfect operating condition. Furthermore, after the second test Ms. Salyers was allowed to operate the scoop for the rest of the shift.

The commission's decision in Ms. Salyers' favor was not based upon her surpassing competence as a scoop operator when she bid for the job. Rather, the commission based its decision upon three conclusions amply supported by the evidence: (1) oper-

ating a scoop is not a particularly difficult job to learn; (2) a male employee with minimal training was assigned to an identical job without testing; and (3) no male had ever been tested before being assigned to the job of scoop operator.

■ A representative sample of the testimony during complainant's case-in-chief was that of complainant's witnesses, Mr. Smith, Mr. Sheets and Mr. Houchins, that they had learned to operate a scoop in fifteen minutes. The employer countered, offering as witnesses Mr. Noel, Mr. Woods and Mr. Moorefield, all qualified scoop operators, who testified that it had taken them months to learn how properly to operate a scoop. On surrebuttal, Mr. Sheets then acknowledged that perhaps it had, indeed, taken half a shift for him to learn how to operate a scoop rather than fifteen minutes.

The commission specifically found that three to four months before complainant's bid, the employer had promoted a male employee, who possessed little or no training or experience, to the position of scoop operator. This male employee was not tested or otherwise required to demonstrate his proficiency on the scoop, and the male employee was not a fully trained operator when complainant entered her bid and submitted to the tests. In fact, the employer admitted that the male employee in question was still being given on-the-job training.

The employer introduced evidence that the complainant was not qualified to operate the scoop, and that on occasion male employees had been tested for jobs involving equipment operation. Thus the evidence on the basic issue of whether Ms. Salyers was accorded disparate treatment because of her gender was in conflict. Upon such a record, however, we cannot say that the commission's decision in Ms. Salyers' favor concerning discrimination was "clearly wrong in view of the reliable, probative and substantial evidence on the whole record." Syl. pt. 5, *Human Rights Commission v. Logan–Mingo Area Mental Health Agency, Inc.*, 174 W.Va. 711,

329 S.E.2d 77 (1985). In Syl. pt. 4 of *Logan–Mingo* we said:

> West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties. Syl. pt. 1, *West Virginia Human Rights Commission v. United Transportation Union, Local 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).

Accordingly, we affirm the commission's decision that Ms. Salyers was the victim of gender-based discrimination and we affirm the commission's award of $400 back pay that both parties agree Ms. Salyers would have earned had her original bid for the job been accepted.

## II.

■ We now must turn our attention to a far more troubling area, namely the commission's award of $7,500 in compensatory damages for mental anguish. The employer challenges this award on the grounds that there was no evidence of mental anguish in the record beyond the complainant's testimony that: "... I came into work and [the job] was posted 'no eligible bidder'. And that upset me...." In the hearing examiner's original recommended decision, the compensatory damages at issue here were referred to as "incidental" damages, and in the hearing examiner's amended recommended decision they were referred to as "psychic" damages.

## A.

In the original case upon which the implied power of the Human Rights Commission to award incidental, monetary damages is based, *Human Rights Commission v. Pauley, supra*, the two syllabus points were:

> 1. Under the authority granted by the Human Rights Act, as provided in *W.Va. Code*, 1931, 5–11–1 *et seq.*, as amended, the Human Rights Commission may make an award of monetary damages to a victim of unlawful discrimination as defined in that Act.

2. Under the provisions of the Human Rights Act compensatory damages may be awarded only upon proof of monetary loss.

In *Pauley,* the commission found Mrs. Pauley guilty of discrimination and awarded the complainant in that case damages in the amount of $480 as compensation for time and effort expended in finding suitable housing; $100 as compensation for embarrassment and loss of personal dignity; and, $100 as exemplary damages.

Ironically, although *Pauley* established the authority of the Human Rights Commission to award incidental damages, we reversed the award of damages in that case, saying:

> Compensatory damages may be awarded by the commission only upon proper proof of monetary loss. No such loss was shown in this case.

*Id.* 158 W.Va. at 503, 212 S.E.2d at 81.

In our later case of *Human Rights Commission v. Pearlman Rlty. Agcy., supra,* the Court's single syllabus point expanded the authority granted in *Pauley* and said:

> The West Virginia Human Rights Commission as part of its cease and desist orders may award to complainant *incidental* damages as compensation for humiliation, embarrassment, emotional and mental distress, and loss of personal dignity, without proof of monetary loss. *W.Va. Code,* 5–11–8. [Emphasis added].

In *Pearlman,* the Human Rights Commission found that the Pearlman Realty Agency had discriminated against the complainant by denying her the opportunity to view a house. The commission entered a "remedial" order requiring the agency to cease and desist from discriminatory practices in the future and awarded the complainant in that case $1,000 as compensation for humiliation, embarrassment, emotional and mental distress and loss of personal dignity.

Although the award of damages in *Pearlman* was only $1,000, this Court nonetheless agonized over whether even such a trifling amount could be awarded without a jury trial. In that regard the Court said:

> The right to trial by jury before deprivation of property is constitutionally required. *W.Va. Const.,* art. III, § 13. Considering our high regard for the sanctity of jury verdicts, and the right of every citizen to be judged by his or her peers, this Court would be the very last to erode this constitutional guarantee.

> However, where the award of damages is purely incidental, as here, and is a means of enforcing the broad powers of the Commission, we find it no more constitutionally odious than the other statutorily authorized penalties and requirements set out in the Commission's cease and desist order, all of which require the expenditure of time and money by the discriminating party. We comprehend no material difference between an expenditure of $1,000.00 to compensate a person aggrieved, humiliated and embarrassed by a discriminator and the financial expenditure which will result from the discriminator's compliance with the other directives of the cease and desist order, such as notifying employees and others of the Commission's order, keeping the records required by the order, adjusting, advertising, and such.

*Id.* 161 W.Va. at 4–5, 239 S.E.2d at 147.

*Pauley, supra,* and *Pearlman, supra,* are the only cases in West Virginia that have directly addressed the implied authority of the Human Rights Commission to award money damages. In *Pauley,* although the right of the commission to award damages was recognized, we allowed no damages because *strict proof* of actual loss was required. In *Pearlman,* although the principle of *Pauley* was extended and actual damages were, indeed, awarded, the amount of money involved was small. Thus, the case before us today is the first occasion when we have been asked to evaluate the authority of the commission to award significant money damages upon surpassingly thin evidence.

## B.

Although there have been some changes in the legal structure since we addressed the damage issue in *Pauley, supra,* and *Pearlman, supra,* these changes in no way require us to extend the commission's authority given by *Pauley* and *Pearlman* to

award money damages without a jury trial. *Pauley* and *Pearlman* clearly limit the commission's authority to awards of only "incidental" damages; in both cases the amount of money involved was nominal. Recently, however, the Human Rights Commission has been awarding substantial "incidental" damages; in the case before us the amount is $7,500, but there have been other cases that either were not appealed or that were appealed and were reversed or affirmed on grounds other than damages, where scores of thousands of dollars have been awarded.[1] Justice Harshbarger's reservations in *Pearlman,* then, concerning a defendant's right to a jury trial when substantial damages are at issue, presaged our holding today.

In 1987 the West Virginia Legislature amended *W.Va.Code,* 5–11–11 to remove from the circuit courts the authority to review Human Rights Commission cases and placed all appeals directly in the West Virginia Supreme Court of Appeals. The West Virginia judiciary does not have an intermediate court of appeals so the West Virginia Supreme Court of Appeals is the only appellate court in the State for criminal and civil appeals. In addition, this Court hears direct appeals from the Workers' Compensation Appeal Board.

All appeals to the West Virginia Supreme Court of Appeals are discretionary with the Court. The procedure in this regard is established by *W.Va. Const.,* art. VIII, § 4 which provides in part:

> A writ of error, supersedeas or appeal shall be allowed by the supreme court of appeals, or a justice thereof, only upon a petition assigning error in the judgment or proceedings of a court and then only after the court, or a justice thereof, shall have examined and considered the record and is satisfied that there probably is error in the record, or that it presents a point proper for the consideration of the court.

From 1 January 1988 until 31 December 1988, the following table describes the workload of this Court:

1/3/89 · STATE SUPREME COURT OF APPEALS · For 1988
DOCKETING SYSTEM—STATISTICAL SUMMARY

| CASE TYPE | FILED | REFUSED | GRANTED | DISPOSED | | | | |
| | | | | OPINION | ORDER | DISMISS | WITH-DRAW | PENDING |
|---|---|---|---|---|---|---|---|---|
| CERTIFIED | 21 | 9 | 17 | 14 | | 2 | | 6 |
| CERTIORARI | 2 | 1 | 1 | 2 | | | | |
| CIVIL | 394 | 275 | 186 | 140 | 5 | 16 | 14 | 156 |
| COMPENSATION | 488 | 233 | 307 | 4 | 265 | 5 | 1 | 182 |
| CRIMINAL | 182 | 137 | 60 | 53 | 3 | 2 | | 57 |
| ETHICS | 13 | 1 | 14 | 9 | 10 | 1 | | 3 |
| HABEAS CORPUS | 195 | 170 | 49 | 2 | 37 | 7 | 2 | 3 |
| MANDAMUS | 183 | 107 | 98 | 14 | 46 | 44 | | 15 |
| PETITION | 47 | 31 | 16 | | 13 | | | 3 |
| PROHIBITION | 96 | 55 | 41 | 11 | 19 | 14 | 1 | 6 |
| TOTALS | 1,621 | 1,019 | 789 | 249 | 398 | 91 | 18 | 431 |

TOTAL CASES DISPOSED OF AFTER FULL HEARING OR SUBMISSION ON BRIEFS = 756

**1.** The Human Rights Commission awarded substantial "incidental" damages in the following cases: *James Jones v. B & O R.R.,* (W.Va.H.R.C., Aug. 20, 1985) (Nos. ES 59–80, REP 449–80 and REP 68–83) (awarded $80,000 for severe mental pain and suffering); *Shirley Boone v. Westmoreland Coal Co.,* (W.Va.H.R.C. Dec. 5, 1985) (Nos. ES–595–83 and ES 596–83) appeal docketed, No. 18271 (Feb. 2, 1988) (awarded $75,000 "for humiliation and loss of dignity, mental and emotional distress"); *Montgomery Gen. Hosp. v. W.Va. Human Rights Comm'n,* 176 W.Va. 580, n. 1, 346 S.E.2d 557 n. 1 (1986) (per curiam in which the $10,000 damage award of the commission not reviewed by this Court).

In summary, this Court passed upon 1,808 cases at the application stage and, in addition, disposed of 756 cases after full briefing on the merits. Our workload, then, does not allow us to provide the type of careful review of all records emerging from the commission that was available in the circuit courts at the time of *Pauley* and *Pearlman.*[2]

Another circumstance that leads us to reaffirm the limited *Pauley* and *Pearlman* precedents is this Court's decision in *Price v. Boone County Ambulance Authority,* 175 W.Va. 676, 337 S.E.2d 913 (1985), where we said in syllabus point 1:

A plaintiff may, as an alternative to filing a complaint with the Human Rights Commission, initiate an action in circuit court to enforce rights granted by the West Virginia Human Rights Act.

In *Price,* partially because of the enormous backlog of cases in the Human Rights Commission that was described in *Allen v. Human Rights Commission,* 174 W.Va. 139, 324 S.E.2d 99 (1984), and partially because of 1983 amendments to *W.Va.Code,* 5–11–13 which expanded the rights of persons alleging discrimination by authorizing actions in the circuit courts, we held that a victim of unlawful discrimination may go directly to our circuit courts and seek damages.

At the time *Pauley* and *Pearlman* were decided, *W.Va.Code,* 5–11–13 [1973] provided that the exclusive remedy for violation of the West Virginia Human Rights Act was a proceeding in the West Virginia Human Rights Commission; consequently, if money damages for violations were to be awarded at all, they had to be awarded by the commission. Such, however, is no longer the case because of the 1983 revisions to *W.Va.Code,* 5–11–13, and on holding in *Price, supra.*

## C.

Although there is not unanimity across the country concerning the necessity of jury trials when money damages for losses other than back wages are sought in discrimination cases, the great weight of authority is that substantial money to compensate for pain, suffering, humiliation, economic losses other than wages, and punitive damages cannot be awarded without a jury.

The seventh amendment to the *U.S. Constitution* provides:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law.

The right to a jury trial under our state *Constitution* constitution is substantially similar. *W.Va. Const.,* art. III, § 13 provides:

In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

The seventh amendment of the *U.S. Constitution* is not applicable to the states. *See Minneapolis & St. Louis R.R. Co. v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed.2d 961 (1916). However, the interpretation of that amendment by the U.S. Supreme Court can certainly inform our

---

2. In 1989 the West Virginia Legislature amended *W.Va.Code,* 5–11–11 to allow an additional option for appeal in certain cases. *W.Va.Code,* 5–11–11 [1989] provides in pertinent part:
   ... in the following cases the appellant may prosecute the appeal in the circuit court of Kanawha County pursuant to section four, article five, chapter twenty-nine-a of this code:
   (1) cases in which the commission awards damages other than back pay exceeding five thousand dollars; (2) cases in which the commission awards back pay exceeding thirty thousand dollars; and (3) cases in which the parties agree that the appeal should be prosecuted in circuit court.

understanding of our similar state jury trial guarantee.

Both the federal and state constitutional jury trial provisions grant the right to a jury trial "in suits at common law." Suits in equity were tried without juries. After the merger of law and equity (in 1938 in the federal courts), many cases contain both legal and equitable elements, usually in the form of the action or the relief sought. Under the circumstances, the Supreme Court has given an expansive reading of the seventh amendment. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (jury trial right in a case involving two discrete claims, one of which was triable by a jury); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (jury trial right where the claim contained both legal and equitable issues); *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (jury trial right where underlying claim is for money damages even though form of action, stockholder's derivative suit, is equitable); *Pernell v. Southall Realty*, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) (jury trial request by either party); *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (jury trial right can apply to new causes of action created by Congress that provide legal rights and remedies); *Tull v. U.S.*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (jury trial right under Clean Water Act). The test most often applied by the Supreme Court under its expansive reading of the seventh amendment is whether the relief sought is essentially legal (e.g. money damages) or equitable (e.g. injunctive relief).

The Supreme Court distinguished *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), which held there is no right to a jury trial in an NLRB unfair labor practice proceeding for back pay. In *Curtis v. Loether, supra*, the court said that *Jones & Laughlin* stands for the proposition that the seventh amendment does not usually apply in purely administrative proceedings.

Another exception to the expansive reading of the seventh amendment by the Supreme Court occurred in *Atlas Roofing Co. Inc. v. Occupational Safety & Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). In *Atlas*, the court rejected a seventh amendment challenge to enforcement procedures established by the Occupational Safety and Health Act (OSHA), 29 U.S.C. §§ 651–678 (1970). OSHA allows either abatement orders or civil money penalties as sanctions for violations of the act, but does not grant the agency power to enforce collection of the penalty by administrative action alone. The agency conducts the evidentiary hearing, rules on the violation, and has the power to issue abatement orders or assess penalties. To enforce collection of a penalty, however, the agency must file an action in a federal district court in which neither the fact of the violation nor the propriety of the penalty may be contested. In *Atlas* the petitioners argued that this procedure violates the seventh amendment by using the federal courts to enforce payment without providing a jury trial. The court held that:

> At least in cases in which "public rights" are being litigated—e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible.

*Id.* at 450, 97 S.Ct. at 1266.

To support its decision in *Atlas*, the court relied on several tax penalty cases and customs and immigration penalty cases, *NLRB v. Jones & Laughlin, supra*, and also relied on dicta in *Curtis v. Loether, supra*, and *Pernell v. Southall Realty, supra*. Thus, the *Atlas* and *Jones and Laughlin* decisions demonstrate that limited exceptions to the right to a trial by jury exist, but that such exceptions must be narrowly construed.

In *Atlas*, the Supreme Court recognized the "public rights" exception to the seventh amendment and applied it to cases "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." 430 U.S. at 450, 97 S.Ct. at 1266. In the case of violations of the West Virginia Human Rights Act, the aggrieved individual is responsible for litigating "public rights" to remedy violations of the act. When an individual acts to enforce "public rights" and, as a minor part such enforcement is awarded "incidental" damages, a jury trial is not required. However, when an individual seeks substantial money damages as compensation for pain and suffering, the individual's role in enforcement of the "public rights" is minor and the narrow exception to the requirement of a jury trial does not apply.

### D.

Our state statute allows the commission, on a finding of discrimination, to issue a cease and desist order, and, in addition:

> ... to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay ... [etc.] as in the judgment of the commission, will effectuate the purposes of this article ...

*W.Va.Code*, 5–11–10 [1987]. The award of incidental damages is implied because the recovery of minor costs or damages would encourage individuals to effectuate the Act's public purposes. In contrast, the statute that allows an aggrieved party to pursue his case in court, states that on finding a violation, the circuit court shall enjoin the respondent and:

> ... order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay or any other *legal or equitable* relief as the court deems appropriate.... [emphasis added]

*W.Va.Code*, 5–11–13 [1983].[3]

Other states' courts that have considered the question of whether human rights commissions (or a parallel administrative tribunal) can award damages in addition to back pay and injunctive relief have taken varying positions. A number of states have statutes that specifically allow damages for mental suffering or punitive damages.[4] However, it should be noted that all such states also allow the grievant the alternative of an action in court, most often with a jury trial guaranteed by statute. In addition, half the states that allow a human rights commission to award damages set a limit (usually $1,000 or $2,000) on such damages, calling for limited discretion by the commission.

A number of states have provisions similar to ours that allow "other affirmative relief ... including but not limited to back pay ... as will effectuate the act." Although most of these states do not allow their human rights commission to award compensatory damages,[5] a few states have

---

**3.** The parallel provision of Title VII of the Federal Civil Rights Act, 42 U.S.C. § 2000e–5(g) authorizes an award of back pay and other equitable relief, but not an award for general or punitive damages. *See Great American Fed. S. & L. Assn. v. Novotny*, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979). In contrast, the language in *W.Va.Code*, 5–11–13 [1983], authorizing a circuit court to grant "legal or equitable" relief in a discrimination case, parallels the provision in the Federal Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, that provides the remedies a court may grant for a violation of that act. The U.S. Supreme Court has held that because this provision calls for "legal or equitable relief," the statute contains the right to a jury trial. *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

**4.** Kan. SA 44–1005 (pain, suffering or humiliation up to $2,000); Ky. RS 344.230 (humiliation and embarrassment); N.Y. CLS Exec. Law § 297 (compensatory damages for mental suffering); Minn. SA § 363.071 (treble compensatory damages and punitive damages up to $8,500); 25 Okla. 5 § 25 (actual damages in housing discrimination, if wilful and wanton, punitive damages up to $1,000); Tenn. CA § 4–21–306 (humiliation and embarrassment); RC Wash. 49.60.250 (mental suffering up to $1,000).

**5.** *McDaniel v. Cory*, 631 P.2d 82 (Alaska 1981) (no power to award compensatory or punitive damages, only by court); *Continental Title Co. v. District Court In and For City and County of Denver*, 645 P.2d 1310 (Colo.1982) (only equitable relief, no legal claim for money damages and, therefore, no right to jury trial); *Gutwein*

interpreted such a statute to allow human rights commissions to award compensatory damages beyond back pay for mental suffering,[6] or punitive damages.

We agree with the majority view of the states with statutes similar to our own that hold such statutes do not allow human rights commissions to award punitive or compensatory damages except for back pay and incidental damages. Allowing the commission to award money other than limited incidental damages, without a jury, would violate *W. Va. Const.*, art. III, § 13. We also emphasize that our statute does allow a grievant to pursue his action in a circuit court and specifically authorizes the court to award *"legal or equitable relief."* *W. Va. Code*, 5–11–13 [1987]. *W. Va. Code*, 5–11–8 [1989] (authorizing the commission to issue cease and desist orders) does not contain a specific authorization for legal relief.

### E.

In the case before us the commission was authorized to award the $400 in back pay because back pay is specifically authorized by *W. Va. Code*, 5–11–10 [1987]. In *Pearlman, supra*, we recognized the authority of the commissioner to award limited incidental damages as part of its cease and desist orders. Back pay is capable of being calculated on an objective, mechanical basis that can be reviewed easily on appeal in this Court. Here, fortunately, the amount of back pay was stipulated, but even when the amount is not stipulated, determining back pay and limited incidental damages does not involve the type of subjective de-

termination, frequently requiring the application of community standards, that substantial punitive damages or substantial damages for mental anguish, pain and suffering, humiliation, aggravation, or inconvenience require. These are issues which, under our system, are constitutionally entrusted to our juries. *See Ross, supra; Curtis, supra.*

The one area in the computation of back pay awards that does require the application of well instructed discretion is the requirement of mitigation. A claimant for lost wages under the human rights law shares with all other plaintiffs the burden of using reasonable efforts to mitigate his or her damages. Therefore, the same rules that we have articulated in other employment contexts concerning mitigation of damages for lost wages should be applied by the commission to human rights cases.[7]

### III.

In the case before us we find that the award of $7,500 in damages by the Human Rights Commission clearly exceeded the commission's legitimate powers under the guidelines of *Pauley* and *Pearlman:* Ms. Salyers presented no evidence whatsoever of "psychic" damages beyond the comment that she was upset.

■ *Pauley, supra*, and *Pearlman, supra*, remain correct statements of the law and they clearly limit the jurisdiction of the Human Rights Commission to award money damages for anything other than lost wages. *Pearlman, supra*, authorized the award of $1,000 in damages. Allowing for

*v. Easton Publishing Co.*, 272 Md. 563, 325 A.2d 740 (1974) *cert. denied* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975) (no monetary award for compensatory or other damages); *Ohio Civil Rights Commission v. Lysyj*, 38 Ohio St.2d 217, 313 N.E.2d 3 (1974) *cert. denied* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975) (no compensatory or punitive damages); *Zamantakis v. Commonwealth Human Relations Comm.*, 10 Pa.Commw. 107, 308 A.2d 612 (1973) (no compensatory damages for humiliation and mental anguish); *Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758 (Iowa 1971) (no compensatory damages beyond back pay); *Mendota Apartments v. D.C. Commission on Human Rights*, 315 A.2d 832 (D.C.1974) (no civil dam-

ages); *Holien v. Sears, Roebuck and Co.*, 298 Or. 76, 689 P.2d 1292 (1984) (no general damages for humiliation and mental anguish).

6. *Zahorian v. Russell Fitt Real Estate Agcy.*, 62 N.J. 399, 301 A.2d 754 (1973) (compensatory damages for pain and suffering); *A.P. Green Serv. D. of Bigelow–L. Corp. v. State F.E.P.C.*, 19 Ill.App.3d 875, 312 N.E.2d 314 (1974) (compensatory damages-foregone wages); *College–Town Div. of Interco, Inc. v. Mass. Comm'n Against Discrim.*, 400 Mass. 156, 508 N.E.2d 587 (1987) (compensatory damages for emotional distress).

7. *Mason County Bd. of Educ. v. State Sup't*, 170 W.Va. 632, 295 S.E.2d 719 (1982).

an adjustment to that amount for inflation, the Commission today is authorized to award up to $2,500 in damages, but absolutely no more other than to make adjustments from time to time to conform to the consumers' price index.

We hold today that if a victim of discrimination seeks relief such as an order requiring the party engaging in discrimination to "cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, admission or restoration to membership in any respondent labor organization, or the admission to full and equal enjoyment of the services, goods, facilities, or accommodations offered by any respondent place of public accommodation, and the sale, purchase, lease, rental or financial assistance to any complainant otherwise qualified for the housing accommodation or real property, denied in violation of [the human rights law]," *W.Va.Code,* 5–11–10 [1987], and limited incidental damages then the proper (but not exclusive) forum is the West Virginia Human Rights Commission under the provisions of *W.Va.Code,* 5–11–13 [1983].

But, if a person alleging discrimination wants substantial money damages in addition to the relief available through the commission, then the proper forum is a West Virginia circuit court. Obviously, because a circuit court possesses both legal and equitable powers, remedies such as reinstatement, hiring, access to accommodations, and other equitable cease and desist orders may also be issued by the circuit court to give full and complete relief under the human rights law. *W.Va.Code,* 5–11–13 [1983].

We recognize that there are complainants who have already prevailed in the Human Rights Commission and recovered incidental damages for humiliation, embarrassment, emotional and mental distress, and loss of personal dignity. Furthermore, there are other complainants who have filed before the commission and have not yet had their cases heard. With regard to pending or decided cases, our authorization

in *Pauley,* and *Pearlman, supra,* of damages for humiliation, embarrassment, emotional and mental distress, and loss of personal dignity, contemplated only "incidental" awards. We approved $1,000 as an incidental award for such damages. That figure may be adjusted for inflation, but the Commission must be aware of its jurisdictional limitations because awarding a higher amount impinges upon a defendant's constitutional right to trial by jury. The commission should be careful to follow the original *Pearlman* guidelines, even to the extent of reviewing cases already decided but not yet presented for appeal to this Court. In 1977, *Pearlman* authorized $1,000; today that amount, when adjusted for inflation is $2,500. In cases already before this Court, excessive awards will be reduced to $2,500 in accord with the principles set forth in this opinion.

## IV.

■ The commission awarded Ms. Salyers $21,225 in attorneys' fees and $1,875.64 in related legal expenses. Appellant assigns this award as error on the ground that it is excessive because it exceeds the fees usually charged for similar services in the area where this case was tried. We disagree.

The goal of the West Virginia human rights law is to protect the most basic, cherished rights and liberties of the citizens of West Virginia. Effective enforcement of the human rights law depends upon the action of private citizens who, from our observations of these matters, usually lack the resources to retain the legal counsel necessary to vindicate their rights. Full enforcement of the civil rights act requires adequate fee awards. *See Orndorff v. West Virginia Dept. of Health,* 165 W.Va. 1, 267 S.E.2d 430, 432 (1980) (discussing the purpose of fee awards in civil service proceedings); *Farley v. Zapata Coal Corp.* 167 W.Va. 630, 281 S.E.2d 238 (1981) (discussing the purpose of fee awards in wage payment and collection proceedings); *Nelson v. W. Va. Public Employees Ins. Bd.,* 171 W.Va. 445, 300 S.E.2d 86 (1982) (dis-

cussing the purpose of fee awards in certain mandamus proceedings).

Determining the reasonableness of attorneys' fees depends upon balancing a number of factors. In Syllabus Point 4, *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986) we stated:

> Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

These standards were adopted from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). Other instances of substantial adoption of the *Johnson* standards include: *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Johnson v. Univ. Col. of Univ. of Ala. in Birmingham*, 706 F.2d 1205 (11th Cir. 1983), *cert. denied* 464 U.S. 994, 104 S.Ct.

489, 78 L.Ed.2d 684 (1983); *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760 (7th Cir.1982), *cert. denied* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal.1974); *Swann v. Charlotte–Mecklenburg Bd. of Ed.*, 66 F.R.D. 483 (W.D.N.C.1975).

In *Allen, supra*, n. 33 we looked to the factors set forth in Disciplinary Rule 2–106 of our *Code of Professional Responsibility* to determine reasonableness of attorneys' fees.[8] *See McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987).

The Supreme Court of the United States in *Blum, supra*, initially calculated the fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate with adjustments to that fee as necessary.[9] The U.S. Supreme Court in *Blum* considered the *Johnson* factors and required reasonable fees "to be calculated according to the prevailing market rates in the relevant community regardless of whether plaintiff is represented by private or non-profit counsel." *Id.* at 895, 104 S.Ct. at 1547. The U.S. Supreme Court further noted that determination of "an appropriate 'market rate' for the services of a lawyer is inherently difficult" and recommended consideration be given to the type of services performed and rates charged in private representation. *Id.* n. 11.

Counsel for the complainant, Betty Jean Hall, has focused almost exclusively on representing women coal miners in sex discrimination cases since 1977. She is one of

---

**8.** Disciplinary Rule 2–106 of our *Code of Professional Responsibility* lists the following factors as guides in determining the reasonableness of attorneys' fees.

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent. These same factors guide the reasonableness of a fee under Rule 1.5 of *Rules of Professional Conduct*, effective 1 January 1989.

**9.** The basic calculation of hours reasonably expended on the litigation multiplied by a reasonable hourly rate—the lodestar calculation—was approved in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

the few lawyers in the United States who specializes in such work. Her bill was based upon an expenditure of 208.4 hours extending from 1981 through 1986. Ms. Hall's office is located in Dumfries, Virginia, and she traveled to Bluefield, West Virginia, in 1981, to attend a fact-finding conference. She served and answered extensive interrogatories; she undertook the extensive personal interview of witnesses; she devoted two full days—separated by a period of about seven weeks—to the trial of this case in McDowell County; she prepared a seventy-one page trial brief that was filed in October, 1985; she participated in arguing for complainant during proceedings related to the preparation of two recommended decisions by the hearing examiner; and, she argued a motion to reconsider the commission's initial unfavorable decision before the commission.

Ms. Hall's hourly charges were $95 an hour during the early years of this case and $110 an hour in the concluding years. During the time that Ms. Hall charged $110 an hour, she had been practicing law between eight and twelve years. Appellant employer argues that her charges exceed the hourly rate that would have been charged by competent lawyers in McDowell or Mercer Counties. But in this regard we note that the appellant employer is represented by a distinguished Charleston law firm, and we doubt that Ms. Hall's hourly rates significantly exceed the hourly rates paid by the appellant.

Indeed, we agree with the appellant that a losing defendant cannot be saddled with attorneys' fees that are unreasonably large simply because the plaintiff chooses a lawyer from New York City or another urban area where overhead costs and prevailing hourly rates make the lawyer's customary and usual charges far above what equally competent West Virginia lawyers would charge. That, however, is not the situation in this case: Ms. Hall's hourly rate was comparable—and perhaps even below— what a young partner in a major firm headquartered in Charleston would charge for a case conducted in southern West Virginia.

The reported cases, as noted, indicate that there are few hard and fast rules in the determination of proper attorneys' fees.[10] The Supreme Court of the United States has recently expressed its anxiety over contingency enhancements under federal fee shifting statutes similar to the state fee shifting statute before us today because such contingency enhancement requires losing defendants to subsidize the lawyers engaged in unsuccessful litigation against winning defendants. Nonetheless, even in *Pennsylvania v. Delaware Valley Citizens Counsel*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), the U.S. Supreme Court recognized that in many circumstances some contingency enhancement is appropriate.[11] We agree that when a plaintiff is litigating a case involving a significant issue of general application, where the likelihood of success is small and the economic value in terms either of money or of injunctive relief to the prevailing plaintiff is small, it is appropriate for a court to consider those factors in awarding attorneys' fees and allow a contingency enhancement to a prevailing party.[12]

In the case before us the appellant argues that Ms. Salyers did not prevail on all

**10.** The great weight of authority is that the lodestar calculation is the general rule in awarding attorneys' fees with occasional contingency enhancement. We would point out, however, that none of the rules concerning the award of a "reasonable fee" under a fee shifting statute impairs the right of lawyer and client to make a private fee arrangement. When significant money damages are at issue in a human rights case, it is perfectly appropriate for lawyer and client to enter into the standard contingency contract. Depending on the terms of the contract, "reasonable attorneys' fees" can either be taken as a credit toward the lawyer's contingent share or they can be added to the gross award and the total sum split—typically two-thirds for the plaintiff and one-third for the lawyer.

**11.** *See Committee on Legal Ethics of W.Va. State Bar v. Triplett*, 180 W.Va. 533, 378 S.E.2d 82 (1988) (discussing risk of loss).

**12.** We have noted that, as a practical matter, a contingency enhancement is often achieved by giving only the most cavalier of audits to the hourly charges. This is one way of making the system work, but contingency enhancements should not then be added to what are already hefty hourly rates for arguably inefficient work.

counts of her complaint and therefore, the attorney's fees should be reduced to the extent that hours were devoted to issues on which Ms. Salyers did not prevail. We agree with appellant's general principle, but we find that in Ms. Salyers' case the appellant failed to refine its general argument to apply to the specific facts before us.

■ As we review the record, we find that the gravamen of Ms. Salyers complaint was that she should have been made a scoop operator and would have been promoted to that position had she not been a woman.[13] On this issue she prevailed entirely and the other allegations of sexual harassment were simply part and parcel of her basic complaint. Often plaintiffs will have one basic problem which, in a complaint, they express in numerous alternative ways, each corresponding to a slightly different legal theory. When this occurs, as it did in the case before us, the fact that the commission or court selects one of the theories upon which to award relief does not necessarily mean that the plaintiff has not substantially prevailed. However, when a complainant sets forth distinct causes of action so that the facts supporting one are entirely different from the facts supporting another, and then fails to prevail on one or more such distinct causes of action, the appellant is correct that attorneys' fees for the unsuccessful causes of action should not be awarded. However, Ms. Salyers' third issue, namely, pattern discrimination, was an extension of her oth-er issues and not a distinct cause of action. Further, limited effort was expended to develop additional facts beyond the facts alleged under her prevailing theory.

In the case before us we find the attorneys' fees and expenses reasonable and supported by the record; accordingly, they are affirmed with regard to the amount charged up to the time that the commission entered its final order. In addition to the attorneys' fees awarded, Ms. Salyers is clearly entitled to attorneys' fees for services rendered on this appeal because she has substantially prevailed in this Court. Syl. pt. 2, *Orndorff, supra; Barnes v. Public Service Comm'n.*, 172 W.Va. 232, 304 S.E.2d 685 (1983). For that reason the case is remanded to the Human Rights Commission for entry of an appropriate order regarding those fees.

Accordingly, for the reasons set forth above, the decision of the West Virginia Human Rights Commission is affirmed in part and reversed in part and the case is remanded to the Human Rights Commission for further proceedings consistent with this opinion.

Affirmed in part, Reversed in part, and remanded.

---

13. The issues decided in commission's order entered 11 June 1987 were:
  1. Whether respondent unlawfully discriminated against the complainant on the basis of her sex by denying her a position as foreman.
  2. Whether the respondent engaged in unlawful sexual harassment against the complainant by interrogating her about a rumored affair.
  3. Whether the respondent engaged in a pattern and practice of unlawful discrimination against its female employees related to training opportunities.
The commission dismissed the claims alleging sexual harassment and pattern discrimination.